IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SCOTT M. SMITH,                )
                               )
            Plaintiff,         )
                               )   Civil Action No. 12-553
       v.                      )
                               )   Judge Nora Barry Fischer
MICHAEL J. ASTRUE,             )
Commissioner of Social Security, )
                               )
            Defendant.         )

# MEMORANDUM OPINION

**I.     INTRODUCTION**

Scott M. Smith ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 8, 10). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on September 18, 2007, claiming a disability onset of September 5, 2005. (R. at 98, 279).[1] His claimed inability to work full-time allegedly stemmed from a mental breakdown following the death of his wife. (R. at 279 – 80, 285 – 86). Plaintiff was initially denied benefits on November 29, 2007. (R. at 64, 279). Per the request of Plaintiff, an administrative hearing was held on March 3, 2009. (R. at 47, 279). The Administrative Law Judge ("ALJ") issued a decision denying benefits to Plaintiff on March 26, 2009. (R. at 44 – 58). On review, the Appeals Council remanded Plaintiff's case on June 16, 2010, for a more thorough analysis of the factual record. (R. at 59 – 63).

A second administrative hearing was subsequently held by a new ALJ on December 1, 2010. (R. at 277 – 98). Plaintiff appeared to testify, represented by counsel, and a neutral vocational expert also testified. (R. at 277 – 98). He argued only for a closed period of disability, ending October 8, 2009, as he had resumed full-time employment at that point. (R. at 279). In a decision dated December 23, 2010, the ALJ denied Plaintiff the benefits sought. (R. at 12 – 28). Plaintiff again filed a request for review of the ALJ's decision by the Appeals Council, but this request was denied on March 9, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 6 – 9).

Plaintiff filed his Complaint in this court on April 27, 2012. (ECF No. 4). Defendant filed his Answer on June 29, 2012. (ECF No. 5). Cross motions for summary judgment followed. (ECF Nos. 8, 10). Plaintiff now contends that he should have been found disabled according to 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.05C (Mental Retardation).

---

[1] Citations to ECF Nos. 6 – 6-3, the Record, *hereinafter*, "R. at __."

## III. STATEMENT OF FACTS[2]

### A. General Background

Plaintiff was born on May 21, 1972, and was thirty eight years of age[3] at the time of his second administrative hearing. (R. at 284). He was a high school graduate with vocational training in plumbing. (R. at 140, 232, 284). Plaintiff lived in a mobile home with his mother and his two teenage daughters. (R. at 283 – 84). His mother handled his finances, but he took care of himself, as well as his two daughters and their dog, home, and yard. (R. at 201, 287, 290). His daughters each received Social Security funds as a result of their mother's death. (R. at 198).

### B. Mental Health History

Plaintiff's medical record contains three psychological evaluations. The first was performed November 2, 2007 by Chantal Deines, Psy.D., on behalf of the Bureau of Disability Determination. (R. at 195 – 203). Plaintiff informed Dr. Deines that he was unable to work following the death of his wife on September 5, 2005, as the demands of working and caring for his daughters at the same time became too great. (R. at 195 – 97). Plaintiff also felt unable to work due to his inability to read; he described being "pushed" through school in special education programs. (R. at 195 – 96). Despite his difficulties, Plaintiff remarried in 2006, and his new wife and two teenaged step-sons came to live with Plaintiff and his two teenaged daughters. (R. at 196). Plaintiff had a driver's license and was capable of driving independently. (R. at 196). He was also a volunteer fireman, of which he was quite proud. (R. at 196, 198). He tried to regularly attend church and helped coach a youth football team. (R. at 197). When asked to share anything else about his life, Plaintiff stated, "I have a hard life." (R. at 201).

---

[2] Plaintiff does not contest the ALJ's findings with respect to any physical limitations; therefore, the court's discussion will be limited to those facts relevant to Plaintiff's mental condition and intellectual capacities. (ECF No. 9 at 5 – 12).

[3] Plaintiff is defined as a, "Younger Person." 20 C.F.R. §§ 404.1563, 416.963.

Dr. Deines observed that Plaintiff was obviously cognitively impaired. (R. at 196). He exhibited a mild speech impediment, poor enunciation, and slow responses. (R. at 196). He otherwise had a good mood and neutral affect. (R. at 198). He was clean and casually dressed. (R. at 198). Thought productivity was in the low-average to borderline range, but there was no evidence of language impairment. (R. at 198). Plaintiff was very aware of his difficulties, and was sensitive to exposing himself to potential failure. (R. at 199). He had a reasonable fund of information, but could not do basic subtraction, multiplication, or division, and used his hands to perform simple math. (R. at 199). Plaintiff showed no problems with memory, and generally responded appropriately and reasonably given his cognitive limits. (R. at 199). His social judgment appeared to be adequate. (R. at 200). There was no issue with insight. (R. at 200).

Dr. Deines concluded that Plaintiff likely had an IQ approximating high mild mental retardation or borderline functioning. (R. at 200). She diagnosed Reading Disorder, NOS, and Rule Out Mild Mental Retardation. (R. at 200). His prognosis was poor due to his inability to read for work, and because he could not manage his own money competently. (R. at 200 – 01). His activities of daily living did not appear to be impaired, however. (R. at 200 – 01). He socialized with family and one good friend. (R. at 200 – 01). In terms of his ability to work, Dr. Deines found only moderate limitation in his ability to understand, remember, and carry out detailed instructions, and slight limitation in his ability to make judgments on simple, work-related decisions. (R. at 202).

On November 28, 2007, state agency evaluator Sharon Becker Tarter, Ph.D. completed a Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff's ability to work based upon a review of the available medical record. (R. at 204 – 20). In it, Dr. Tarter diagnosed Plaintiff with organic mental disorder. (R. at 204). She found that he was moderately limited in

4

his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 204 – 05). Plaintiff was not otherwise limited. Dr. Tarter justified her findings by citing to the evaluation of Dr. Deines – which was adopted. (R. at 206). Plaintiff was deemed capable of making simple decisions, carrying out short, simple instructions, completing a normal workweek without exacerbation of psychological symptoms, and sustaining a routine without supervision. (R. at 206). Additionally, Plaintiff's intact memory processes, and ability to adapt and interact socially, indicated that he was capable of engaging in full-time work. (R. at 206).

On January 21, 2009, Plaintiff was also evaluated by Lindsey Groves, Psy.D. (R. at 234 – 47). At the meeting, Plaintiff informed Dr. Groves that he did not know how to read, and could not follow written directions – citing this inability as a major reason for his difficulty in maintaining full-time employment. (R. at 235). Plaintiff explained that he had been in special education courses from first grade through high school. (R. at 235).

Dr. Groves performed a WAIS-III intelligence test, and found that Plaintiff had a verbal IQ of 65, and performance IQ of 68, and a full scale IQ of 63. (R. at 238). Plaintiff's scores were believed to indicate significantly impaired ability to efficiently process information, and severely delayed visual short-term memory, psychomotor and processing speed, and visual-motor coordination. (R. at 239). Dr. Groves further opined that Plaintiff's scores indicated severe deficits in attention and concentration. (R. at 239).

Dr. Groves ultimately diagnosed Plaintiff with mild mental retardation. (R. at 235, 240). Her prognosis was minimal/ poor, due to Plaintiff's cognitive impairments. (R. at 236, 242).

5

She believed that he was "100%" disabled. (R. at 237). It was believed that as a result of his mental impairment he would miss work approximately once per month. (R. at 242). He was also incapable of managing his own benefits. (R. at 242). In terms of specific functional limitations, Plaintiff was noted to have extreme difficulty maintaining concentration, persistence, or pace, and poor to no ability to understand, remember, and carry out complex or detailed job instructions. (R. at 245 – 46).

Plaintiff's record also includes files from his years in grade school. Plaintiff was consistently provided with special educational support. (R. at 169 – 92). His academic achievement was consistently low. (R. at 177 – 78). Testing in 1979 showed that Plaintiff's IQ was 68; in 1981, testing demonstrated an IQ of 72. (R. at 173, 180). Plaintiff was classified as Educable Mentally Retarded. (R. at 183).

### C. Administrative Hearing

Plaintiff explained that while he graduated from high school, he lacked the ability to read. (R. at 284 – 85). He left his last full-time job following the death of his wife on February 25, 2005. (R. at 285). He attributed his inability to work to what he termed a "nervous breakdown." (R. at 285). Plaintiff was, in fact, terminated from his previous employment when his employer refused to accept a doctor's note excusing Plaintiff's absence for a concussion. (R. at 285 – 86). He was never hospitalized, nor did he seek treatment for, his mental health condition. (R. at 285 – 86). Plaintiff only began to take medication for Attention Deficit Hyperactivity Disorder ("ADHD") three months prior to his hearing. (R. at 291). Plaintiff had also recently been ordered by a state court to undergo anger management after being accused of beating two dogs. (R. at 297 – 98).

Following the loss of his full-time job, and in spite of his mental condition, Plaintiff did engage in odd-jobs including demolition and landscaping work. (R. at 287, 289). While not working, Plaintiff was still able to care for himself and his two daughters. (R. at 287 – 88). Plaintiff stated that he was not ready to return to work, but that he did so out of necessity. (R. at 289). He ultimately returned to full-time work because he needed money and was losing his possessions. (R. at 289). Plaintiff testified that his full-time employment provided health benefits. (R. at 284). It was his belief that if his current employer were aware of his inability to read, he would be terminated. (R. at 289). Plaintiff relied on his mother to pay his bills and manage his money; he was incapable of writing a check. (R. at 290).

## IV. STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his

7

past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[4], 1383(c)(3)[5]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v.*

---

[4] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

*Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 90-91 (3d. Cir. 1986).

V. **DISCUSSION**

In her decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairments in the way of allergies, asthma, borderline intellectual functioning, and a reading disorder. (R. at 18). In spite of these impairments, the ALJ determined that Plaintiff did not meet or medically equal any of the disability listings under 20 C.F.R., Pt. 404, Subpt. P, App'x 1. (R. at 18). Plaintiff objects principally to this determination, arguing that the ALJ erred in failing to find Plaintiff disabled according to Listing 12.05C (Mental Retardation). (ECF No. 9 at 5 – 12). Defendant countered that the medical evidence supported the ALJ's rejection of this listing,

because Plaintiff failed to demonstrate deficits in adaptive functioning beginning prior to age twenty-two and continuing through the alleged date of disability. (ECF No. 11 at 9 – 14).

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the ALJ adequately met her responsibilities under the law.

> The applicable listing states, in relevant part:
>
> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> …
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.05C. The ALJ declined to find Plaintiff in conformity with the above listing for two reasons: first, Plaintiff's IQ scores as found by Dr. Groves were not in accord with his level of functioning, and were, therefore invalid; second, there was no evidence of deficits in adaptive functioning manifested prior to age twenty-two and

continuing through the date of Plaintiff's disability. (R. at 18 – 22). Each argument will be addressed, in turn.

As established by the United States Court of Appeals for the Third Circuit in *Markle v. Barnhart*, 324 F. 3d 182 (3d Cir. 2003), a finding of disability under 12.05C requires a claimant "i) have a valid verbal, performance, or full scale IQ of 60 through 70, ii) have a physical or other mental impairment imposing additional and significant work-related limitations of function, and iii) show that the mental retardation was initially manifested during the developmental period (before age 22)." *Id*. at 187.

The second prong of the above test is clearly met in this case. Similarly to *Markle*, the ALJ here determined that Plaintiff suffered medically determinable severe impairments, including allergies, asthma, borderline intellectual functioning, and a reading disorder. (R. at 18); *Markle*, 324 F. 3d at 187 – 88. The ALJ went on to find that these impairments restricted Plaintiff to work not involving concentrated exposure to extreme heat, extreme cold, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation, and involving no more than simple, routine, repetitive work involving understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions, and not requiring reading or performing mathematic computations as essential elements of the job. (R. at 23); *Id.* This is sufficient to satisfy Listing 12.05C's requirement of a physical or other mental impairment imposing additional and significant work-related limitations. *Id.* (citing 65 Fed. Reg. 50746, 50772).

However, where Plaintiff failed to meet his burden was at the first prong and – in particular – third prong of the test. The ALJ called into question the veracity of Plaintiff's most recent IQ test results as well as his claim of mental retardation prior to the end of the

developmental period by citing to Plaintiff's longitudinal history. Testing in 1979 showed that Plaintiff's IQ was 68; in 1981, however, testing demonstrated an IQ of 72. (R. at 173, 180). In 1991, Plaintiff graduated high school with vocational training in plumbing. (R. at 19 – 26, 140, 177). In 1992, at the age of nineteen or twenty, Plaintiff began working six hours a day, five days a week. (R. at 19 – 26, 137). By 1994, he was working full-time, and from 1998 until his alleged disability onset date, Plaintiff worked full-time for one employer. (R. at 19 – 26, 137). Up until the present, Plaintiff managed to marry twice, raised two daughters, acted as a volunteer fireman, helped coach a youth football team, maintained a driver's license, and took care of pets, his home, his yard, and grocery shopping. (R. at 19 – 26). Additionally, Drs. Deines and Tarter's analyses of Plaintiff's mental abilities were not nearly as severe as those assessed by Dr. Groves. (R. at 19 – 26, 195 – 203, 204 – 20).

What the ALJ gleaned from this history was a notable lack of deficits in adaptive functioning prior to age twenty-two through the time of his alleged disability. *Cf. Markle*, 324 F. 3d at 188 ("Here, the evidence before the ALJ is consistent with a finding that Markle's mental condition remained constant from childhood through the present"). Further, the ALJ was entitled to reject Plaintiff's IQ scores based upon objective evidence, and did so without use of personal observations of Plaintiff or speculative inferences based upon the record. *Markle*, 324 F. 3d at 186 – 87; *Morales v. Apfel*, 225 F. 3d 310, 318 – 19 (3d Cir. 2000). The Court of Appeals has noted that justifiable rejection of IQ scores occurred in cases wherein the claimant worked in the private sector, had a driver's license, was the primary caretaker of a young child, and completed the ninth grade without special education courses, and wherein another claimant had a two year college degree, was enrolled in a third year of college, had a history of skilled jobs, and had taught algebra. *Markle*, 324 F. 3d at 187 (citing *Clark v. Apfel*, 141 F. 3d 1253, 1255 (8th Cir.

1998); *Popp v. Heckler*, 779 F. 2d 1497, 1499 (11th Cir. 1986)). Plaintiff's case is not dissimilar from those cited.

While the court does not dispute that Plaintiff suffered from significant mental impairment, the ALJ's decision rationale clearly demonstrates that this impairment did not meet the requirements for a finding of disability under 12.05C. Plaintiff's IQ score of 72 in 1981, lack of contradictory IQ scores until testing with Dr. Groves in 2009, his graduation from high school and vocational training, and his work history prior to reaching the age twenty-two demonstrates that he did not exhibit the degree of deficit in adaptive functioning envisioned under 12.05C. Moreover, his long, steady work history, as well as other outside activities, provided significant objective evidence which justified the ALJ's rejection of Dr. Groves' IQ scores – scores which were not accompanied by any statement regarding validity.

## VI. CONCLUSION

Based upon the foregoing, the decision of the ALJ is adequately supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed. Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: December 14, 2012
cc/ecf: All counsel of record.